In our final case today, we have the United States of America v. Mr. Erick Hobbs. An appeal by Mr. Hobbs, represented by Mr. Hoffman. Good to have you with us, sir. Thank you, Your Honor. And may it please the Court, again, I am Josh Hoffman on behalf of Mr. Hobbs. We're before you asking the Court to consider three issues. One is the exigent pinging of Mr. Hobbs' phone in the absence of a warrant, since the Rehafe case, a Rehafe issue, and an impermissible constructive expansion of the indictment. Since Rehafe, we did do supplemental briefs, but since Greer was decided over ruling Gary in this circuit, we did not do supplemental briefs. And the test at this point is whether or not the appellant is able to present a significant argument on appeal as to whether or not there was evidence he might have submitted at trial to rebut any case that the government might have had that he had knowledge of status. In accordance with that, Mr. Hobbs has submitted a declaration, and we have submitted it through the e-filing system, of course. He explains that the cases that made him a felon happened when he was 19 years old, approximately 20 years almost before the events of this case. We don't have, that I found, at least a whole heck of a lot of guidance on what exactly sorts of factors would qualify. I don't know what the... You can take your mask off if you like, sir. Thank you, Your Honor. I would like to. It was suggested by the Supreme Court that factors such as the fact that nobody was ever incarcerated might be indicative that nobody realized that they were a felon, and the length of time that passed. Now, obviously, Mr. Hobbs was incarcerated, but a lot of time had passed. We will not find any statements in the record, and this is not in the record, but there was some sort of a document purged, I understand, in Baltimore City. We will not find any documents that Mr. Hobbs signed acknowledging his rights or lack thereof as a result of the first cases. He has stated in his declaration that he had a very, very limited understanding of the legal system. That has changed, by the way. What's the point you're making? Is this on the regular issue? Yes, Your Honor. I'm sorry. What's the point you're making? Didn't he admit at trial that he was a felon? Your Honor, I was referring to a very specific exchange, and a very important one, and I need to focus on that a lot. This Court, in the Gary opinion and the Medley opinion... The answer to Judge Wynn's question, yes or no. He admitted that he was a felon, but not that he knew he was a felon before he was charged, and that is, to see that, we must look at the context in its entirety. It can't be done just from that statement, and before rehafe, there was no need to make distinctions of this sort. The reason Mr. Hobbs testified about that at all was because the government had introduced a jail call, and on the jail call, he was speaking to his wife about his case and what he perceived as weaknesses in the case, I suppose, and he said something to the effect of, I didn't shoot anybody with the gun, I didn't hurt anybody with the gun, the implication being that, well, you must have had a gun. Mr. Hobbs testified to the effect of, I knew this call was recorded. In fact, in the record on the recording, it says this call is being recorded. Everybody knew that Mr. Hobbs was being recorded, and that would have been a confession the same as it was to the police, and on examination, he was asked by me a couple of times, as we all know, because it had been stipulated already, you were a felon not allowed to possess a firearm. We were not talking about his knowledge at any given point in time. It's very unfortunate how it came out, but again, pre-rehafe, there was no need to make this distinction. When he was speaking, he had his charging documents in front of him. He was in jail. He had been held without bail. If he didn't know it before, he knew it then. There was no reason for him or for anybody else to ask him, well, what did you know one moment before that arrest? And it came out on the record in a very unfortunate way. He did not admit to having the knowledge of his status and therefore not being able to possess a firearm. It was not part of his testimony to make a defense along the lines of, well, of course I would have never had a gun because I knew I wasn't allowed to have a gun. I don't know if that would have been greatly availing either. I think common sense tells us that much. So in full answer to your question, Judge Wynn is, no, he did not admit to being aware of his felon status beforehand, but definitely during the call, but after the event itself, which is of course what counts. I hope that clarifies it, and that is an important issue, and I would ask the Court to give that somewhat of a latitude. And although Gary and Medley were both overruled, there was some very strong dictum in there having to do with the overruled. I don't know that this Court even... Is it the strongest issue to us? No, Your Honor. It's one of three. I've been around a long time. I'm watching my time, Your Honor. Why don't you just tell me, well, that we understand your position on that and get on to this suppression motion. Thank you, Your Honor. I will be happy to. On the suppression motion, the police arrived at the house of Foreman, the witness, and she was told that Mr. Hobbs had broken into the house, or not broken into the house, broken a window, forced his way into the house, demanded it at gunpoint to take a TV set, which he did then do, and then she called the police. The police arrived and were told what I just said. The police then followed Ms. Foreman to the police station in order to keep her safe. That's how they testified. That was around her government's opposition brief, their first brief, around 7.05 p.m. Is it your position there were not exigent circumstances? Your Honor, it is my position there were not, and if there were, they were certainly abated, and if they were not abated, that the police did not act in a way that supports their good faith belief in exigent circumstances. How did they abate if the defendant said that he was going to harm any police officer who tried to capture him and also made threats against the victim's family? Just because the victim and her daughter were safe doesn't mean the rest of her family was safe, and we have the specific threat to harm the police officers, so how can you say the harm abated? The comment about the police officers was something he had made to Foreman and Foreman had relayed to the police, and the comment was along the lines of if they don't recognize my ID or they try to shoot me, I will shoot first. What was written on the on the T-Mobile exigency form was not exactly a verbatim of what Foreman relayed to the police. Isn't it also a fact, hadn't he just been out of prison for attempted murder and robbery for just a few weeks before this happened? No, Your Honor, not to my knowledge. He'd been out of jail for something closer to seven or eight years. How long had he been out? He had been out, I know he was employed, I apologize I don't have this detail, but since 2014 I know he was employed, so it had been at least five years, but more along the lines of I think eight or nine. He had not been incarcerated recently at all. Yeah, so you're saying how much time had passed since his release? At least five years, and I'm being conservative. Five years. To make sure I don't overstate it, at least five years. Hadn't he had a jail term, though, that he had just gotten out of jail? Wasn't there something in this record, or maybe I'm confusing it with another case, but I thought there was something in this record that said that he had just been out of jail, maybe not for the murder and robbery, maybe that was several years ago, but hadn't he just been released from jail for something, arguably making him a greater danger as well? I hope it's you, Your Honor, not me, because I'm not aware of that at all. Okay. Not at all. Okay, well, then I'm maybe confusing it with another case. And certainly no convictions, if so. Well, let's just go straight to the stat. You've got a situation here, Supreme Court, we don't even talk about Koppner too much, Koppner is really a big case in this whole deal here. Supreme Court made it clear that, you know, if you got an objectionable officer, an objectionable, reasonable belief that there is this emergency that exists, then you have an exception. And so now the question before us is, and on whatever review standard you say we have here, pretty clear what we do, is that when we look at these circumstances, what they are saying is, you got specific threats, as was alluded to earlier, against a police officer, specific threats against this woman, you got a violent criminal history, whether it was yesterday or five years ago, he has a valid criminal history. And then, you know, the proximity to these offenses that are going on, he breaks into the house, he makes these threats, and now he's gone. And so then the question is, can this officer move to the next step and keep in tight arms with the officer's statement about, well, if you don't do this, it's going to be 30 days, or it's going to be a long time before we can get to him. Someone stops this individual, a police officer stops him, that's what he's thinking about, you know, and you know that can happen. I mean, you got a violent person who's already said, I'll be the first to shoot. That's not good. That's not good for your case, is it? No, Your Honor, it's not. And he was armed, right? He's allegedly armed. Well, the paperwork here that went to T-Mobile says, was armed. That was their basis, and Your Honor mentioned quite rightly the objective belief. The police's at all with an objective belief, nor with a respect for the warrant requirement. Objectively reasonable belief. Objectively reasonable, Your Honor. They followed her to the station to keep her safe, where they also took a statement, but they didn't keep her there. Nobody seemed to have track of her. Nobody said, and nobody was able to say at the suppression hearing, an answer to the question, where was Ms. Forman when Mr. Hobbs was apprehended? Did you do anything to keep her safe? Were any of these family members contacted? Detective Nesbitt, who was leading the investigation and did fill out the form, said something to the effect of, well, I didn't know how to get a warrant in the middle of the night. Except he did. This was noted by the trial judge in, almost in the same breath. I remember the tone, but of course the tone is not on the record. The exact wording, and it is quite extraordinary, and to the extent this is a factual review, and deference is accorded, and we're looking for something clearly erroneous, the judge said, I believe that this know how to get a warrant in the middle of the night, because he applied for warrants for the vehicle and for a residence within the hour. Received them both within the hour. He doesn't need to get a warrant if there's executive circumstances, though, but even though that's one of the factors, but if that real threat there is an objectively reasonable belief based on specific articulable facts and reasonable inferences, that's where we are. Your Honor, we, when speaking of what factors are dangerous enough, I don't think we're looking for a bright line rule. I think we're looking for the danger per situation. We could do many, many hypotheticals. They were trying to find this guy, and they wanted to find him as quickly as possible. They did. And take him into custody or whatever. They did, and they asked for a warrant for that GPS tracking at 3 o'clock the next day, as a courtesy to the court. So they went to T-Mobile and tried to get his location. They did, and we argue that that was absolutely self-evident. Well, and also the record does show, does it not, that the police had found T-Mobile to be notoriously slow in responding to requests? I don't know if the record showed notoriously slow. Or very slow, extremely slow, taking a matter of days. The officer was unclear about it. The officer was unclear about it. I would draw this court's attention to a case out of D.C., that is the Jones case, 168A3rd at 7-11, not at a 7-11, where they were tracking somebody who had committed multiple sexual assaults against random individuals, escorts. Okay, so this is ongoing. It wasn't any sort of abated exigency, abated emergency. There was danger. And several hours passed, and the court said during this time they could have been getting a warrant, and that factor was what decided the court against the exigency in saying that it was not okay to surpass the warrant requirement. There are only about 25 seconds left. I want to mention it on my initial so that State can reply. On the constructive amendment, there was two things that Mr. Hobbs might have been convicted of. One was ammunition, found at his residence, where he lived with three other people, or two other people, depending on which story from the factors. He only was charged with one count in the indictment. That was for February 3rd for the gun and ammunition that was found on him. The jury actually remarkably sent a note out asking, does the prosecution need to prove both of those, or just one? The answer was just one. But there's no doubt that the jury impermissibly was allowed to consider both. And we, the very best case scenario, it was a 50-50 coin toss. It was part of the boat. The hand was in the statue. Oh, these were separate days, Your Honor. Separate findings. Separate. It can be separate. These were separated by time and location. If Mr. Hobbs had been found with 30 guns on one occasion, that would be fine for one count in the indictment. The case law was, of course, very clear. Charged him with the firearm and ammunition. Yeah, referring to the ammunition in the firearm. Well, it was loaded. Yes. And it's against the law to possess either one if you're convicted felon. Yes, but also against the law to convict him on a one-count indictment for ammunition found at a completely separate location on a completely separate day. The jury was never, it could have been corrected, and everybody was responsible, including myself. We were all there. And this was an absolutely impermissible whopper of an error because the jury was absolutely allowed to go back there and consider, well, do we believe in either one of these events? And the case law and review, I know, is already very clear that that is not permissible. There has to be two counts in the indictment if you're going to talk about multiple locations. It's not a continuing course of events. There was a pretrial conference. It's not on the record. It was a phone call with the judge and the prosecutor and myself. But there was some discussion about that, about maybe the irrelevant evidence, probative, tending to show the fact that maybe he had a firearm and things like that. And it doesn't excuse any mistake. Did you try the case? Yes. Yes, Your Honor. And to be honest, that's why I'm really hopeful this Court will resolve that. What did the record show as to where the firearm was found? On the, the firearm on the ground next to the vehicle, somewhere on the ground. It was unclear. Close to the, close to the driver's side door? The officer's testimony is inconsistent on that. Where did, what did the record, what did the evidence show? In the light most favorable to the prosecution because they won. The jury, but they, based on that rather extraordinary note, the jury asked, what if we don't believe in the ammunition in the firearm? Where was it found, the firearm? Near the car is the best we can do. How close? Depends on which officer you believe, Your Honor. All right. We just don't know. We don't know whether the jury believed that to be true or whether they simply believed the ammunition in the apartment was true. And they were told in response to their note that, that either one would work. Now, it's . . . Let's see what the government has to say. Thank you, Your Honor. Mr. Moore. Good to have you with us, Mr. Moore. Thank you, Your Honor. Good morning, Your Honor. Did you try the case too? Did I try the case? No, Your Honor. Okay. Yeah. But good morning, Your Honors, and may it please the Court. Brandon Moore on behalf of the United States. I'll say that the questioning from all three of Your Honors was spot on. This was a very serious situation and police, by the time police had arrived on scene, Mr. Hobbs had already smashed the victim's window. He pointed a gun at them. He repeatedly threatened to kill both victims, the mother and the young child, as well as the police and as well as their family. And they also had information that he had fled at that point while still armed. So I think, faced with those circumstances, police believe that Mr. Hobbs posed an imminent threat to them and to others, which was reasonable. And that justified the need, not just to find him, but to find him right away. So— But in the context of what was happening, because these are specific, articulable facts, and when we start comparing one case to the other, I think these cases are probably very narrow to each particular case and specific facts. I don't know how useful it is to look at one set and another and say, you did that here because the case is different. But here, when the defendant approached the lady here, the victim here in this case, he said to her, you know, I want my TV. And then made these threats that seemed to be conditional threats. Once she gave the TV, he left. And then the police then hands her down in custody. And while they have her in custody, he says, well, you know, it's a threat to you. But then lets her go. I mean, how is that helpful in terms of understanding how serious they think this is? If you think someone is out there getting ready to commit an act of violence against a young lady and a child, you have them there. Why would you just say, go home? I think a few things, Your Honor. I think the first thing is that it's a couple hours before they let her go. And in that time, they're also starting to investigate Mr. Hopps. They're getting the exigency pings ready and they're taking the steps they need to go find him. The other thing is that the threat is not just against her. It's against her entire family, at least the ones that are in the vicinity to be harmed. And it is against— The question there, as you're explaining, is why didn't they notify the rest of the family? And that's a good point too, Your Honor. And I think it gets back to the question of reasonableness. Wouldn't you think that's reasonable for an officer if you have a threat, if there's a threat against your family, that that officer would make that, you know, at least ask, well, who are these people and let them know, put them on notice? Absolutely. You try to find out who they are. But if you look at it in the context of this case, you don't know how many of them there are. You don't know where they are. You don't know where he is. You don't know what he's seen. I point your attention to the 911 call where she's saying to the operator, it's her belief that he was actually outside watching her as she came back to the house. And then that's a thing that he does. And in fact, she tried to come to her house from a different area to try to avoid any of that happening. He does it anyway. So some of the information that they have is that he could be seeing all of this go down. They have no idea where he is. The other part to that is they're also worried about the officers who could encounter him on the street having no idea, no idea that they are going to be coming into contact with the person who is threatened to shoot police. And I bring it back to what I said initially to answer that question about the reasonableness. You can't expect police officers to notify everybody and then to send somebody out to every single family member to make sure they're safe or tell every single family member where to go. Did they do that whatsoever to identify any of the members? Not that they went out to everyone, but did they even ask or is there someone around? I think that, no. But I think they're thinking at that point that the more prudent thing to do is to eliminate the one threat instead of trying to prevent 15 at one time. I take it back to the fact that Detective Nesbitt is the only person at this point running point on the operation of what to do next. There are officers on scene. There are, of course, officers at the command center getting the pings and then organizing the arrest. But Detective Nesbitt... I don't know if he's dead or dead, but she's got a woman with him. Did they even ask her, well, who is it that you believe could be a part of this threat? I mean, even if it is a bunch of people out there, I don't know. She may have had one sister, but she could have had just, you know, one mother. I don't know. They didn't ask. I think the point of the question is, you know, were they just dinking around or did they not, you know, do the things they're supposed to? I will say at the same time, they were doing several things. They were corroborating a lot of what she had to say. And again, it's a frantic, frantic situation. And so someone in some reasonable circumstances would ask. I think what they also did was reasonable. They corroborated what she said. Well, what's his criminal history? They looked that up. It's very violent. What's his Facebook? What's his phone number? Where does his family live in close proximity to you? They secured the scene, at least while they were on the scene, and they saw the broken glass, right? So they're trying to the extent they can to figure out everything that's happening. And just because they don't do the one thing that the defendant points out they should do doesn't mean that they did not act reasonably in that instance. I'm concerned about whether they asked for too much, being police officers, on this exigency court. You got on here. You look, you're after his one, you're after his current location. And you, he pings. But they're not completely accurate. You found out he was in a, well, two miles, two mile radius. That's a pretty big circle. That covers thousands and thousands of homes and businesses, a big area of Baltimore, right? Uh, I . . . And, and, and Judge, uh, Jazza, I was a little bit concerned about the next thing you requested were the call detail records. And you used the call detail records, uh, extensively here that you, right? We did not use . . . Information he got from T-Mobile. We did use the call detail records. We did not use them extensively. Well, you used enough to pin him down to a street address. That's correct. Uh, in, in terms of the . . . But you had to use those call detail records to pin him down to a street address. You got him, you found his precise location in Baltimore and sent the police out there and arrested him. He was there. We, we, we pinned him down to a precise location that was actually out in . . . Judge Jazza was concerned about a little bit of overreach. I, I will say that he was in public, driving on a public road when police had actually found him. Uh, in terms of the, the area, I, I caveat this because Carpenter doesn't, uh, take this as an excuse, but that was a fairly extensive area. They're not looking for everybody who's in those pings. They're not searching into people's houses that are in those pings. They're looking for one person for a limited period of time and they end up finding him wide out in public, uh, driving along a public road. And he tried to get away. I, I'm sorry? And he tried to get away. And he tried to get away as soon as police showed up. And he wrecked the car. And he put yet another person in harm's way. Uh, back to . . . Uh, and where was the, the gun found? Uh, I heard Your Honor's question, uh, on, uh, previously. My understanding is that it was within a few feet on the ground of the car. Where? A few feet away on the ground . . . A few feet from where? The car. Well, from the driver's side door? I believe it was against the curb. Uh, hold on. You don't know, you don't know. I, I, without more precise information, my, my recollection of the record is that it's, uh, up against the curb a few feet away from the car. Um, and getting back to your concern about the call detail records, I believe the district court's concern with the call detail records is that the officers used that to craft historical information about his whereabouts that had nothing to do with where he currently was. And that's not the way they used those records. All they did was, uh, they used them to identify a phone number. And that was it. They looked at a frequently dialed phone number and then they used their own databases from that point to figure out a location for him to be within the, the very large ping. So they received the call detail records without a warrant, but they didn't use them. Is that your explanation? They did use them in part. They used them only to identify a phone number. In fact, he told the government, he told the judge first that the first hearing hadn't been used. Then he had to, then he went, came back to her and said, we better have another hearing. And then he told her they had been used. Right. It appears they just had not interviewed the one witness who had actually used that information. And then upon finding that out, they went right back to the judge. And, and I'll say that we, we had a conversation about how this fits in with the cases because it's so specific. I think this fits squarely within the category of cases where this court and others has found exigent circumstances, right? I'm looking at Caraballo, Kennedy, Malveaux, the other cases that we, the both of us cited in our briefs and Toyer. I think those are more apt because those involve actual threats. Kennedy involves a threat to a police officer, that there's an exigency there. Malveaux involves the threat to a victim, as does Toyer. Caraballo is different because, you know, the main victim in that circumstance is already dead. But police in that instance, very much like the police here, are worried about other law enforcement actors then being in harm's way. And those are circumstances where the exigency, exigency of that situation justified those limited searches in that regard. And then you look at the cases where there was no exigency, and you see that those cases are just categorically different from the situation that we have here. One of the big ones that's discussed in both briefs is McDonald, right? That's when police are entering into a house, and then once inside, they find the adding machine. There's no exigency there. There's no emergency. They're casually in the house. Nobody's going anywhere. Nobody's fleeing. Nobody's destroying evidence. Nobody's in danger. It's categorically different from the case that we have here. Mowat, where we draw out a lot of these Turner factors for the exigency circumstances. Police are investigating a noise complaint, and they're banging on the door inside, right? That's a case to where the police just don't want to take the time to get a search warrant. It's more convenient not to do it. It's not about convenience here. It's about saving lives, and that's what makes this categorically different. And I believe in his reply brief, the defense sites dangle, and I took a look at that one, too. There, there's no exigency because the target of the threat is already arrested, unarmed. They're trying to get behind a locked door at a grenade that nobody is saying is about to explode. It's a very stable environment here. The threat is inaccessible to anyone, and nobody on the scene is taking any measures that give any sort of indication that this is an emergency. Again, this is categorically different. Everybody is treating this like an emergency, and they're trying to find him as fast as they can. And so I think the other part is that we look at how reasonable it is to the timing of getting a warrant, and I think that the district court there appropriately balanced that. Well, he didn't get a warrant. He just sent the request. He sent the request, and that's correct. Not quite the request, the T-Mobile. But you asked for all these call detail records. That's what I'm, you're saying the judge approved of the fact, proposition that you didn't use them for anything except trying to immediately locate him. That's correct. We use a limited . . . In fact, asked for, and I assume got call detail records for 48 hours, last 48 hours, call detail records with cell sites, last 48 hours, continuous location, pings every 15 minutes for 48 hours. You've got all that. So you, and you didn't have to ask for all that, but maybe you did make sure you got what you got there. The detail records get you close to needing a warrant, because you've got telephone numbers and who they called and who they're dealing with and all that kind of stuff, right? I, especially if you're talking about historical information, particularly in light of Carpenter, I, I would agree, but . . . But that's just the circumstances where we need to locate him. That's correct. And in fact, the . . . Find him. Yes. And get him in custody if we can. Yes. I don't have any problem with that. But I wanted to make sure you didn't overuse or the judge found you didn't overuse or oversecure getting call detail records without a search warrant. And, and actually I think this, this shows the good faith on behalf of the officers. Even though they check these boxes, that's not, that's not at all what they use it for. They're not trying to figure out where he was before. They're not trying to pin him in any sort of private location. They're just trying to find him right now. And they use a limited amount of information from those records for very limited purposes. Who he's called in the last 48 hours doesn't necessarily find him right now. It is helpful though because they use that information to then get an address in their own databases. So, so it is relevant for their search. And, and without it, they probably wouldn't have been able to find him right away because the, the meters of the, the radius of the, the pings were, were so great. So they're at least helpful in that regard. I'll also say that it's not just, you know, the, the officer seeking that information or T-Mobile just being willing to dish it out. If you, if you look at the form, T-Mobile actually cites their legal authority for that. They, they cite 18 U.S.C. Sections 2518, 2702, and 3125. And just, I, I'm paraphrasing those statutes, so forgive me. But basically they say that if the service provider has a, a good faith basis that— You're talking about the T-Mobile form. The T-Mobile form. The one that was used here. The one that was used here, JA-619, the bottom third of the form. It says, you know, we're relying on those three statutes. And if you read those— I see that you got it all right there. Yeah. And if, and if you read those— Is this a, this is a form that T-Mobile came up with or that the government came up with? Who came up with these, these forms anyway? It says at the top, exigency form. It's to get the stuff without a warrant. That's what it's for. I don't know who came up with— You fill out the exigency form. We don't need a search warrant. And you email it to the, to the telephone company. And I don't know, I can't be able to find in this record how you all knew it was T-Mobile was his, was where his cell phone was registered or where it was used. That was his server or whatever they call it. But you said we sent it to T-Mobile. Nobody, nobody else. T, T, the— It used the T-Mobile form. The victim did reveal what the defendant's phone number— Is that in the record some way? I didn't find that. My best guess, without taking the time to look for it, is that the, Ms. Forman did reveal what his— I assumed that she probably did, but I didn't find it in her, how you all knew to go directly to T-Mobile. And as to, as to the form, I don't, I don't know who made the form, but I know who made the statutes. So Congress recognizes in these scenarios that yes, you should get a court order for those, but there are very specific circumstances to where an officer can ask for a very limited set of information on an emergency basis if death in serious harm is imminent. And then the statutes all follow, also follow up to say that— But you know, all that really goes back to the power determinations, whether there's any circumstances. Regardless what T-Mobile has there, it can have whatever law it wants up there. They are not the ones that are in jail right now. They're not being challenged here in terms of their conduct. They did what the officer indicated they would do, and they did it in the usual fashion here. But what do you make of the detective saying that getting a warrant was just a courtesy, would be a courtesy? I think what he is saying at that point is that he— this is two days after the fact, a day after he'd gotten the emergency pings. I think that is an act of good faith on his part. He did not actually have to get that warrant, but I think what he's trying to communicate to say, your Honor, a judge is reviewing— What was the warrant for? So this is precisely it. So when a judge is reviewing his actions, I think he's trying to communicate like, hey, I went and got this very quickly, but I want to make sure that I communicate that I had the probable cause at the time, that the reason wasn't that I just didn't want to get a warrant, I just didn't have the time. So he follows up— How long did it take him to get that warrant? That particular warrant was 90 minutes from the time he applied for it and then got it signed. But that's also in the middle of the day. When he actually did that. Your rights are different at night than they are during the day because the judges are not available. Is that where we're going with this? No, absolutely not. In fact, there was a judge available, and in fact, he did get a warrant. Because of the exigent circumstances. There's a different calculus when there's a reasonable belief that somebody's life is at stake, and at the time he requested the exigent pings, he reasonably believed that police officers' lives were at stake, her family was at stake, and then possibly her and her— His argument was, at least his statement was that, well, we went this exigent circumstance, right? Because it's going to take so long to get this warrant. And we don't want to upset the judge, you know, wake him up at night. You judges don't like to be waked up at one or two o'clock in the morning, I guess, for a warrant. So let's just go this route. Is that where we are? He's making the calculus that getting a warrant is going to take an hour, an hour and a half. Give it to T-Mobile. You're not sure how long T-Mobile's going to respond to that. But it was also an argument that they were going to respond quicker to, some way, some reason, they'd respond quicker to the form, exigency form, than they would respond to the search warrant. Yes, and so the officer is making— Which doesn't make any sense. They wouldn't respond to the search warrant that a judge has signed. But they'll respond to an exigency form that the officer signed. It's not that T-Mobile wouldn't respond to the search warrant. I mean, the search warrant would—I assume the affidavits for the search warrant would say this guy's dangerous and we need him right now. They'd tell the judge that. You could absolutely tell the judge. But there was testimony that the judges weren't available, I think, also, in this record. And that they were slow in responding to the thing. I think just the testimony, I think, just supports that the process for getting a warrant would take longer. And in this particular instance, the police officers thought that every moment was important, that there was a process available to them. Well, for all of me, it's important. He threatened to kill a policeman. He threatened to kill the little girl. He threatened to kill her mother. It was important. But there's a lot of—there's some conflicts in the evidence about the things that Judge Winsgate did. It was certainly possible for him to get a warrant. I'd say two things with regard to the ping. For getting a ping warrant in particular, I think the concern is, because there's an understanding that it may take a while to get the pings, I think the officer is just worried about calling up the judge and having the judge respond. You're not going to get this back for a while anyway. Why am I getting called in the middle of the night? But if you do want to get that warrant, it's obvious from the next two days that you can get it within an hour, an hour and a half. Can you do both? Can you, you know, begin the process of the exigent circumstances but at the same time seek to get a warrant on them? Theoretically, it's possible. But again, I'd point your honors back to the exigent form. The form requires the officer to certify that getting a warrant is unfeasible at that time and that you're making that request because of the circumstances. And then it also says at the bottom that, you know, this isn't true, you know, you could be held liable for, you know, civil or criminal liability. If they say it's unfeasible and you put in for the warrant and you actually get it, then you got a problem. Yeah, and there's a legal circumstance to that. But I'm also thinking about what is a reasonable person, if I'm an officer looking at that form, I'm going to do what it takes to confirm with the form, to conform with whatever T-Mobile says is the state of the law and try to do that. I'm not— Let me just ask one. There seems to be an incentive for the officer to find exigent circumstances over getting a warrant. The incentive being, you get it quicker, I can move, get this done better, more efficiently, as opposed to going for the warrant. That's work. I got to wake the judge up and then who knows when the judge, and going back to Judge King's question, which really does kind of concern me, what is, why in the world is it that a company would take 30 days to answer a warrant, but a police officer come to it, it's got this little form up there that says this is the law, they'll do it right then. And it seems to me that the judge could easily put in that order, this shall be effectuated immediately and under the same circumstances as if this was exigent circumstances. I don't see why that would be written into every order. If you think there's a problem, then give the warrant, and then indicate you are to execute this as though this is exigent circumstances because the warrant justifies it. Is that wrong? Well, I would hope not, because then that would actually frustrate actual exigent circumstances. But at the time this is happening, though, that does not appear to be one of the options that he has. Right, but Mr. Moore, and I think this is at least what I see underlying Judge Wynn's concern, and that is, are we letting the cell phone company drive what the law is, what their response rate is to a warrant versus their response rate to the emergency ping request, and doesn't that turn the law on its head? And should we be endorsing this? No, and I want to take a step back. The standard is the time it takes to get a warrant, and again, I will say that at least in the time that he went to get a warrant that evening and the next day, it took at least an hour, and he's thinking, I need that time, I need that time, I need that time. But I do think that the law allows for the circumstances of what happens when you do request that warrant, and I think that's evident in the statutes that T-Mobile is relying on, the separate process that Congress allows them to have to get those emergency pings right away, and obviously the exception here. It shouldn't be that it turns on, T-Mobile is just going to ignore this warrant or else. I think it just depends on the circumstances that you have going on, the options that you have at your disposal, and the things that you reasonably believe that the law allows you to do, and that's precisely what the officer did here. Let me go back to that form again briefly. You're saying that T-Mobile fixed this form up and gave it to the police officers? Yes. Somebody in their legal counsel's office or something? I don't know where within the organization. You don't know where the form came from? I know it came from T-Mobile. He called T-Mobile to get a copy of it and then send it back. And it says that he has to certify that the urgency of the situation, as you said, right there in the middle of the page, makes it unfeasible to obtain a written legal demand for the information sought. Accordingly, I'm requesting release of the following customer data, and then he checks those things off, name, address, current location, call detail records, call detail records, continuous location, and then he checks on the up-to-top immediate danger of death and serious physical injury to any person. And that's what we're talking about here. But it has to be unfeasible on the court, or it is unfeasible, according to this form, to obtain a written legal demand. That's talking about a warrant, is what I read into it. It's unfeasible to get the warrant, but supposedly you've got 24-hour judges. That's correct. Yeah. And the officer is thinking that every . . . I don't know why you wouldn't go both ways, or at least go to the . . . if you're going to go or get the warrant. I see I'm way over time, so may I please respond to that? We're talking about the Fourth Amendment. I . . . It would be reasonable to try every direction. We want to protect his mother and child and police officers that might be shot and all that. And I think that the way the analysis works and what the Fourth Amendment asks of us is that if you have multiple reasonable things that you can do, if you have option A and option B, option B is not nullified simply because you didn't choose option A. We look and we say option B is reasonable, too. And that's what we're asking here. There is a lot of things he could have done, but every single step he takes is reasonable in light of the circumstances. Unless the Court has any other questions for me, I think that our briefs adequately address the other points and I respectfully ask that you affirm. Thank you. Thank you. Judge Keenan, anything else? Thank you very much, Mr. Moore. Thank you. We appreciate you. Mr. Hoffman. Thank you, Your Honor. What this Court is being asked to endorse, Judge Keenan, is right on the record. What this officer said was it was a courtesy. This is our standard practice. I didn't need to get a warrant. Everybody's acting like it's an emergency when it comes to getting Mr. Hopps. Judge Chastanow cut the lawyers off, and it's in the record, started asking them directly, I see you checked the box for call detail records. Did you use them? Everybody's there, the police and everybody's, no. And then the government made its disclosure some days later, about a week later, saying we did. And we had that the second. You're talking about the discussion at the first hearing. Yes, Your Honor. Yes, Your Honor. That's right. They said they didn't use the detail records. That's right. And then it turned out that they did, and we're back. And it turns out what they did was... Judge Chastanow said that if he had used the detail records, this could have been different. Could have been a problem, exactly. But even in spite of the fact that they testified as such, which I believe shows bad faith, it turned out to be okay anyway. When we talk about options A and B, option B, if that's the exigency option, that's a heavy burden to carry if we're circumventing the warrant requirement here. And we have an officer saying, this is what we do. I'm allowed. I don't have any business having to ask anybody's opinion. There is no judges being woken up in the middle of the night. He got two warrants in the middle of the night. If he was so concerned about T-Mobile's response, absolutely the best thing to do would have been to apply for the warrant, maybe send the T-Mobile form first, and then the warrant immediately after. This is the best thing. The reason he didn't is said right on the record. By detective, I mean by he, Detective Nesbitt. He said, because I don't have to. That's our standard procedure. That's what this court is being asked to endorse here. And that, I think, is scary. My colleague mentioned McDonald. Police were invited into the house. The exigency was the armed man downstairs. They could have come up the stairs at any minute. Or the case with the grenade in the room. Nobody could access the grenade. It's still an explosive. But was the exigency evaded because the doors were locked? It seems that the only valid exigency that could possibly be claimed is, well, what about the random officer that pulls him over on a traffic stop? Because Mr. Hobbs wasn't going anywhere, as far as we know. There was no family members mentioned. In fact, Mr. Foreman testified that he didn't know any other family members except maybe her son. Maybe. Nobody else. She didn't give them the names. They didn't ask the names. They didn't keep track of her. Nobody was taking exigency. Well, he said he would not be taken alive by the police. So they needed to get him off the street. You said some random officer pulled him over. The random officer could have been killed. So they were in a hurry. They had to be in a hurry. We had no way to prove that. It was an exigent circumstance. And they could have done better, perhaps. But the question is not whether they could have done better. The question is whether what they did was constitutional. Yes, Your Honor. Fourth Amendment. Exactly right. And I believe the presumptions have to weigh in favor of the warrant when we have something like this, where we have this kind of flippancy. We have this complete misrepresentation of the situation when it comes to the ability to get a warrant in the middle of the night. Why is this officer saying he doesn't know how to get a warrant in the middle of the night in the same night that he does? I said he could have done better, but that's not the question where he could have done it differently or better. The question is whether it was constitutional, what they did. His good faith belief. What they did worked. And they caught your man. Speaking of call detail records. Before he hurt anybody else or before he hurt himself, although he was pretty clever. Incidentally, it was mentioned that he fled. In fact, and this was brought out only at cross-examination of the officer during the trial proper. In fact, when the police did attempt to apprehend him, he stopped his car. He pulled over. It was only when the police got out of the car wearing, I understand, the black junk suits where the word police is written in white and with their guns drawn. Then he got back in the car and fled and crashed. He was, and there's no credible way to understand that except for that the police scared him. You wouldn't be pulling your car over for anybody, but the police, I wouldn't think that they had, they testified that they had sirens on the dashboard. He pulled over, he was cooperating. He wasn't shooting anybody except for he fled when the police jumped out. That's what we have going on there. The call detail records, which of course go to a larger intrusion. The testimony by the police were that they used those as a kind of a cross-reference to show who he had been talking to. And now we can check the addresses of these and based on the pings, we'll find an address with somebody he's been talking to recently and that will get us there. What the police did then, further testimony was they waited at the address that based on their call detail records, they were able to pretty much ascertain was probably where he was, waited for him to leave and then followed him from there. So they did- The fact of the matter is they found him right quickly. They did find him right quickly. They did. They did find him quickly. They got to the distinction she formed. It worked. It did work. But they did not show the respect to the Fourth Amendment that should have been shown in my opinion. And I think it's very clear from the case law because this opened a terrible door. Your opinion is not the law. What I would urge the court then, not the law. What I would urge the court should be the consideration here is what doors are we opening up? If the court will permit me just to brief this hypothetical, a spousal situation. One spouse, say, has a gun and unlike Mr. Hobbs, they lived there with the other spouse. So we know they're coming back. Now the officers get there because the threat of violence, nobody shot anybody just like Mr. Hobbs. We might ask is every time there's a first degree assault, as we call it in Maryland, that's anytime you point a weapon at somebody or worse. A second degree assault is any unconsent to touching and incorporates all common law definitions of assault and battery. Any of these times, if there's a threat of such a thing, it's their standard procedure in Baltimore County. Are we endorsing that? I would urge that the answer to that is no. There's got to be a protection built into there. My hypothetical about the spouse is Mr. Hobbs has this TV that it was supposed to be all about. The spouse, though, who's now threatened with a firearm, maybe they have a history of it. Then they're drunk or something and they've got this gun or the gun's locked up in the house and nobody knows where. Is this an exigency? Maybe it is. Maybe it is. What I'm urging this court is that there's implications for cases like that here and I don't know which way we're going with this in our society. The potential for this sort of tracking, their standard procedure, again, is immense at this point. Parallel construction is something we've all heard of. We're at the very edge of the warrant requirement meaning anything. So each one of these cases do present opportunities for the court review whether there were specific articulable facts or reasonable inferences from which it could be. The danger comes when you begin to try to do the same thing in every case by saying, well, that happened in that case and therefore you don't do in this case the specific fact. But you've got to look at all the things there. Here you do have the express threat to the police and that wasn't just a general threat, it was a pretty specific one. So how, I mean, doesn't that kind of set this particular case aside a bit? If it were, it depends on the credibility, I would say, Your Honor. We have this witness telling the police that his mother's from Afghanistan which he knew perfectly well, and this was in trial, not suppression. Determine the credibility in an exigent circumstance. The police claimed that it was important to their exigency analysis that they were able to corroborate the broken window. It's objectively reasonable. Is it objectively reasonable for an officer to feel that there's a threat that exists against a police officer if there is a specific threat made? My answer to that, Your Honor, is it might but it will not justify completely ignoring the warrant requirement to the extent that we wonder as a couple in with the rest of the facts. I mean, you got a fellow who pretty much has a record. It may not have been he just got out of jail but he's been in jail a few times and what he does, pretty violent stuff and he does it not only against the mother, he does it against the child in there and I mean, all these things are together and it's one of those things where you got to make some determination. I agree with you. We don't want to take them too far to make it broad to apply to every situation, every domestic dispute situation but here you, when you get that specific threat on the police, someone that says, I will not be taken alive, you can't, you got to take that serious. I agree, Your Honor, but there's also law to the effect that the police may not trigger the exigency by their actions. Now, if we're talking about a police officer. What would that mean? Going and doing their duty to go and get him because of this threat and they triggered an exigency circumstance. That is the case law, that is the case law that they cannot make the emergency happen faster as a way to circumvent the warrant requirement. But it's their duty to go now and sue him. He's telling you if you do. That'd be like a traffic situation. That didn't happen here. No, it did not happen here. The duty here is to respect the Fourth Amendment is the presumption every time and we need officers stood in conclusion obviously I'm out of time. We need officers that are showing the proper respect and treating the exigency as they claimed it was. If they are not treating it as such and they're not acting accordingly and they're testifying in a way that is incredible and contradictory and horrible misrepresentations, that may be the situation where the court might want to say, we're analyzing the danger. Yes, we are, but we're also analyzing the alternatives. Also part of the test, the good faith, the objective belief based on a reasonable officer. And compare these officers and their behavior to that. Mr. Hoffman, we've given you some extra time and we really appreciate your work. Thank you so much, Your Honor. We appreciate your great familiarity with the record. Mr. Moore, we appreciate you. Thank you very much. But we're going to take this case under advisement and we'll adjourn court pending further proceedings this afternoon and tomorrow. May I have the clerk? This honorable court stands adjourned until this afternoon. God save the United States and this honorable court.
judges: Robert B. King, James Andrew Wynn, Barbara Milano Keenan